IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| AMY WALKER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CASE NO. 1:22-cv-00299-RAH |
| EXPERIAN INFORMATION | ) [WO] |
| SOLUTIONS INC., et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

This matter involves alleged violations of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681, *et seq.*, and the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692, *et seq.,* by Defendant IC System, Inc. (ICS) in connection with an allegedly fraudulent AT&T DirecTV account opened in Plaintiff Amy Walker's name.  ICS has moved for summary judgment on the FCRA and FDCPA claims and Plaintiff has moved for summary judgment on the FCRA claim. With the parties' motions being fully briefed and thus ripe for decision, for the reasons more fully set forth below, ICS's motion is due to be GRANTED in part and DENIED in part and Plaintiff's motion is due to be DENIED.

### I.  JURISDICTION AND VENUE

Subject matter jurisdiction is conferred by 28 U.S.C. § 1331 as to Plaintiff's federal causes of action.  The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both.  *See* 28 U.S.C. § 1391.

1

## II.   STANDARD OF REVIEW

A court must grant summary judgment "if the movant shows there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law" based on the materials in the record. Fed. R. Civ. P. 56(a), (c). The court must view the evidence and make all reasonable inferences drawn therefrom "in the light most favorable to the nonmovant." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Applicable substantive law identifies those facts that are material. *Id.* An issue is not genuine if it is unsupported by evidence or created by evidence that is "merely colorable, or is not significantly probative." *Id.* at 249 (citations omitted).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can satisfy its burden of proving the absence of a genuine dispute by citing to materials in the record or by showing the nonmovant cannot produce evidence to establish an element essential to their case to which it has the burden of proof. Fed. R. Civ. P. 56(c)(1); *Celotex Corp.*, 477 U.S. at 322–23. If the movant meets this burden, the burden shifts to the nonmoving party to establish "specific facts showing that there is a genuine issue for trial" with evidence beyond the pleadings. *Celotex Corp.*, 477 U.S. at 324. Generally, a "mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252.

"The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment." *Godard v. Ala. Pilot Inc.*, 485 F. Supp. 2d 1284, 1291 (S.D. Ala. 2007). The Eleventh Circuit has explained that "[c]ross motions for summary judgment will not, in themselves, warrant the court in granting summary judgment

unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984).

## III. BACKGROUND

The pertinent facts are lengthy, but undisputed:

### A. The DirecTV Account

At some point in 2020, someone under the name of Amy Walker signed up for DirecTV service on AT&T's DirecTV website by completing an online application for service. The applicant provided Plaintiff's first and last name, social security number, and date of birth. (Doc. 132-3 at 51–53.) The requested service address was on East Columbia Road in Newville, Alabama, and an email address and phone number for the applicant were provided. (*Id.* at 63.) An email verification was sent to the email address provided by the applicant, and the account was verified by an acknowledgment from the email address recipient. AT&T then sent an installer to the service address who met with an individual who signed, illegibly, various documents authorizing the installation. (*Id.* at 54, 58–62; Doc. 132-7.) Once service began, billing statements were sent to "Amy Walker" at the service address, and a credit card was used to make three separate payments to AT&T on the account, two of which were later reversed. The account phone number, email address, and service address (Newville) have never been associated with Plaintiff. (Doc. 132-5 at ¶ 8; Doc. 132-6 at ¶¶ 10–12, 27.)

On May 21, 2021, AT&T referred the account to ICS, its contracted debt collector, for collection. With the referral, AT&T provided the name, service address, date of birth, email address, phone number, and social security number on the account, as well as the delinquency balance. (Doc. 123-1 at ¶¶ 11–12; Doc. 132-3 at 70–72; Doc. 160-4.)

### B. AT&T's Contract with ICS

Under its contract with ICS, AT&T could only refer "validly due and owing debts to [ICS] for collection." (Doc. 123-1 at ¶ 7.)  Recognizing that there may be assertions of identity theft on some of its account referrals, the contract also contained certain procedures regarding claims of identity theft.  Among other things, if during a phone call on a referred account someone claimed identity theft or fraud, the ICS representative was required to direct that person to the DirecTV website where the person could directly contact AT&T about the issue. (Doc. 132-3 at 97–100.)  AT&T would then investigate the issue from its own records.

### C. ICS's Actions

Before initiating collection activities and to confirm the accuracy of the account information provided by AT&T concerning the account at issue, ICS transmitted the social security number on the referred account to Innovis Data Solutions (Innovis), the National Change of Address database, and Melissa, Inc.[1] (Doc. 123-1 at ¶¶ 14–17; Doc. 160-5; Doc. 160-6.)  With the social security number, Innovis determined that the social security number belonged to an "Amy Walker" who lived in Ozark, Alabama.  (Doc. 123-1 at ¶ 17; Doc. 160-5; Doc. 160-6.)  That is the Plaintiff.  (Doc. 123-1 at ¶ 17; Doc. 160-5; Doc. 160-6.)

On May 24, 2021, ICS sent a letter entitled "collection notice" to Plaintiff at her Ozark, Alabama address.  (Doc. 123-1 at ¶ 18; Doc. 160-7.)  The letter informed Plaintiff that her account had been turned over to collections and that it was not being reported to any credit reporting agency ("CRA") at the current time.  The letter also

---

[1] Each of these third-party vendors assist ICS in verifying that the information transmitted from AT&T is that of the actual account holder. Innovis provides ICS with demographic information associated with a specific social security number. (Doc. 123-1 at ¶¶ 14, 16.)  Melissa, Inc. verifies that the address provided by a creditor is properly formatted.  (*Id.* at ¶ 15.)  And the National Change of Address database is compiled by the United States Postal Service and ensures that ICS uses up-to-date addresses for account holders.  (*Id.* at ¶ 16.)

included a validation notice stating that if Plaintiff notified ICS within thirty days of receiving the letter, ICS would then obtain verification of the debt. (Doc. 123-1 at ¶ 19; Doc. 160-7.)  ICS received no correspondence back from Plaintiff in response to the letter.  (Doc. 123-1 at ¶ 20.)

On May 27, 2021, an ICS representative placed a phone call to the phone number on the account.  A person answered, informing ICS that it had "the wrong Amy Walker" and that she was not associated with an Ozark address.  The ICS representative then updated ICS's account notes, noting that the phone number on the account was not a number where the account debtor could be reached.  (Doc. 123-1 at ¶ 21; Doc. 160-8.)

Then, on June 1, 2021, Plaintiff called ICS claiming that someone had fraudulently used her social security number and disputing that the DirecTV account was her account.  (Doc. 123-1 at ¶ 23; Doc. 160-9.)  Because Plaintiff claimed identity theft, the ICS representative asked Plaintiff a series of questions and provided her with DirecTV's website address to submit a fraud claim.  (Doc. 123-1 at ¶ 24; Doc. 160-10; Doc. 160-11.)  Immediately following the call, the representative placed a 60-day "hold" on the account to allow Plaintiff time to contact AT&T regarding her fraud claim.  (Doc. 123-1 at ¶ 25.)

The DirecTV website gave directions to individuals who wanted to dispute an account on the basis of fraud or identity theft.  To investigate and resolve the dispute, AT&T required individuals to submit a fraud package that included a certain form of identification, two forms of proof of residency from a specified time period, and a signed affidavit. (Doc. 132-25; Doc. 132-2 at 103–04.)

On June 10, 2021, Plaintiff again contacted ICS and informed them that she would be sending her fraud package to AT&T over the weekend. (Doc. 123-1 at ¶ 26; Doc. 160-12.)  Plaintiff called ICS again on June 21, 2021, verified her name and address, disputed the DirecTV account, and stated that her "Theft of Identity"

5

package had been received by AT&T. (Doc. 123-1 at ¶ 27; Doc. 160-13.) Plaintiff also advised that she was going to "take out a warrant" on the person who was stealing her identity. (Doc. 160-9 at 4.) The record does not show that Plaintiff ever filed a theft report against the person who stole her identity.

On June 21, 2021, AT&T received a fraud package from Plaintiff. (Doc. 132-3 at 103–04.) Upon receipt of the package, AT&T notified ICS that the account was being investigated for theft of identity. (Doc. 132-3 at 80.) While Plaintiff did include her driver's license, birth certificate, social security card, utility bills, and her residential lease (doc. 132-3 at 78–79, 103–104; doc. 132-25; doc. 132-26; doc. 132-15), Plaintiff did not include a signed affidavit of fraud, nor a second valid proof of residency, (doc. 132-3 at 104–05). Plaintiff called AT&T on July 6, 2021 and was advised of the deficiencies. (*Id.* at 105–106.) She then resubmitted the same deficient fraud package documents sans the affidavit and second proof of residency on July 21, 2021. (Doc. 132-15.)

On July 22, 2021, AT&T completed its investigation and concluded that Plaintiff had failed to substantiate her claim of identity theft. (Doc. 132-3 at 106.) AT&T then notified ICS that the investigation was completed and that the account balance purportedly owed by Plaintiff "was sustained."[2] (*Id.* at 80.) Following receipt of AT&T's decision, ICS reported the account under the social security number on file to Experian, Innovis, and TransUnion in early August 2021 as "disputed." (Doc. 123-1 at ¶ 28; Doc. 160-14.) This reporting was the first occasion in which ICS reported the account to any CRA. (Doc. 123-1 at ¶ 28.)

### D. ICS's Investigation

After ICS began reporting the account to the CRAs as disputed, Plaintiff twice disputed the account directly with Experian that August on its website. When using

---

[2] According to ICS, when a debt has been investigated after a dispute and determined to be valid, it is "sustained." (*See* Doc. 132-2 at 106.)

6

Experian's online dispute website, consumers must select a category related to the dispute, such as "Not Mine" or "Identity Theft," and can provide a brief description of the dispute. (Doc. 123-4 at ¶¶ 14–16.) Consumers who claim "Identity Theft" as a reason for the dispute are instructed that they cannot proceed with their dispute online and must contact Experian directly or in writing. (*Id.* at ¶ 17.)

On August 7, Plaintiff visited the website and selected "Not mine or No knowledge of account" instead of "Identity Theft" on the website from a dropdown list of possible dispute reasons and included a statement that she never lived at the service address and that her social security number had been stolen. (Doc. 123-1 at ¶ 29; Doc. 132-6 at 2–3, 14.) Per its policy, Experian then categorized the dispute as "Not his/hers. Provide Complete ID." (Doc. 123-4 at ¶ 17; Doc. 132-6 at 14.) An Automated Credit Dispute Verification (ACDV)³ was then sent to ICS that same day. (Doc. 132-6 at 3.)

Four days later, on August 11, Plaintiff submitted a second dispute through the Experian website, this time selecting "Other reason" from the dropdown list, not the "Identity Theft" option, and included a similar statement as the August 7 submission. (Doc. 123-4 at ¶¶ 15–16.) Per its policy, Experian categorized this dispute as "Consumer states inaccurate info. Provide complete ID/account info." (*Id.* at ¶ 15.) An ACDV was sent to ICS that same day. (*Id.* at ¶ 15.)

According to Experian, had Plaintiff selected "Identity Theft" as the dispute reason, Experian would have required her to contact them directly by telephone or in writing. (*Id.* at ¶ 17.) Experian would have also manually reviewed the dispute by employees specifically trained to process fraud and identity theft claims. But since Plaintiff did not select "Identity Theft" as her dispute reason, a manual review

---

³ An ACDV is an "indirect dispute" made by a consumer directly to a CRA, who then in turn transmits that dispute to whomever furnished the account for investigation. (Doc. 123-13 at 111–12.)

7

was not conducted, and Experian did not inform ICS that Plaintiff's dispute was based on identity theft. (*Id.* at ¶¶ 18–19.)

ICS has a policy of closing accounts and requesting deletion of its credit reporting tradelines for accounts that have "Identity Theft" as the dispute reason. (Doc. 123-1 at ¶ 30.) But since Plaintiff did not select "Identity Theft" in her Experian submission, ICS submitted the dispute through an automated review program, comparing Plaintiff's name, social security number, and address on the dispute form to the information provided by AT&T. ICS then verified that its credit reporting was accurate; that is, that the AT&T account debt was "disputed." (*Id.* at ¶ 31; Doc. 123-5 at ¶ 11–12.) No ICS employee actually investigated the first ACDV; it was examined using an automated process. (Doc. 132-4 at 254; Doc. 132-28 at 2; Doc. 132-27 at ¶¶ 24–25; Doc. 132-9 at 5.)

By the time ICS received the August 2021 disputes that Plaintiff had initiated with Experian, ICS had already ceased all collection activities. (Doc. 123-1 at ¶ 33.) And by November 19, 2021, AT&T recalled the account from ICS. (*Id.* at ¶ 34; Doc. 160-5; Doc. 160-6.) Two days later, ICS requested that Experian, Innovis, and TransUnion delete any of ICS's reporting of the debt associated with the account. (Doc. 123-1 ¶ 35; Doc. 160-14.) These three credit reporting agencies apparently did so. Still unsatisfied, Plaintiff filed this lawsuit on May 16, 2022.

## IV.   DISCUSSION

### A. FCRA

Plaintiff contends that ICS's reporting of the very existence of the account to the CRAs, even as a *disputed* account, violated the FCRA because the account was fraudulent and because she had denied owning the account to AT&T, ICS, and Experian. In particular, Plaintiff alleges that ICS violated FCRA by failing to fully and properly investigate her fraudulent account claim and in failing to review all relevant information provided by the CRAs. (Doc. 1 at ¶¶ 86–96.)

8

In its summary judgment motion, ICS raises two arguments.  First, it argues that Plaintiff's dispute about ICS's reporting of the account constitutes an unactionable "legal dispute," and not an actionable "factual inaccuracy." (Doc. 123 at 13.)  Second, ICS argues that since Plaintiff "did not even qualify for a credit score, . . [ICS]'s verifications . . . did not cause her claimed damages." (*Id.* at 2.) Plaintiff has moved for partial summary judgment, arguing that ICS did not conduct a reasonable investigation as a matter of law.  (Doc. 125 at 1.)

Congress enacted FCRA "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007).  It governs CRAs such as Experian or TransUnion, and "furnishers," that is, those entities that supply consumer information to CRAs such as ICS.  *See Hunt v. JPMorgan Chase Bank, N.A.*, 770 F. App'x 452, 453 (11th Cir. 2019) (per curiam).  When a consumer disputes the completeness or accuracy of information provided by a furnisher to a CRA, the furnisher must (1) conduct an investigation of the disputed information; (2) review all relevant information provided by the CRA; and (3) report the results of the investigation to the CRA.  *See* 15 U.S.C. § 1681s-2(b)(1).  If the investigation reveals that the furnished information to the CRA is inaccurate, incomplete, or cannot be verified, the furnisher must either modify, delete, or permanently block reporting of that information.  *See id.* § 1681s-2(b)(1)(E).

The Eleventh Circuit has made clear that "[a] plaintiff must show a factual inaccuracy rather than the existence of disputed legal questions to bring suit against a furnisher under § 1681s-2(b)." *Hunt*, 770 F. App'x at 458 (citing *Chiang v. Verizon New Eng. Inc.*, 595 F.3d 26, 38 (1st Cir. 2010)).  In *Hunt*, for example, the consumer argued that the furnisher incorrectly reported a twenty-two-month delinquency on the consumer's loan because he believed "the filing of [a] Foreclosure Action and acceleration of the loan relieved [the consumer] of any obligation to make monthly

payments." *Id.* The Eleventh Circuit was unpersuaded by this argument and held that, even if the consumer was correct, the furnisher's "purported legal error was an insufficient basis for a claim under the FCRA." *Id.* In other words, a legal dispute cannot support a claim under FCRA. *See id.*

The Middle District of Florida dealt with a similar fraudulent account issue in *Uppal v. Wells Fargo Bank, N.A.*, No 8:19-cv-1334-T-02JSS, 2020 WL 6150923, at *2 (M.D. Fla. Oct. 20, 2020) (citing *Chiang*, 595 F.3d at 38). *See also Creel v. Equifax*, No. 1:20-cv-1960-CC-WEJ, 2020 WL 9595385 at *4–5 (N.D. Ga. Aug. 12, 2020), *report and recommendation adopted, Creel v. Equifax* No. 1:20-cv-1960-CC-WEJ, 2020 WL 9595382 (N.D. Ga. Nov. 9, 2020) (dismissing FCRA claim where plaintiff alleged that he did not have a contract with creditor and the debt was not valid). There, a consumer sued the creditor claiming that the creditor had forged a loan in the consumer's name, had improperly foreclosed on her property, and then had failed to investigate her dispute of the creditor's reporting on the account. *Uppal*, 2020 WL 6150923 at *1. The district court observed that proof of a factual inaccuracy is a necessary element of a FCRA claim, and "[w]hen a plaintiff merely asserts a legal challenge to the validity of an existing debt, the plaintiff fails to demonstrate a factual inaccuracy in the furnisher's report of that debt." *Id.* at *2. When addressing the merits, the district court noted that the plaintiff "bases the FCRA claim on her belief the note is a forgery" and "even present[ed] several forensic reports as evidence of the note's alleged forgery," but "this [was] an improper basis for a claim under § 1682s-2(b) [because] the [p]laintiff's forgery argument is a *legal defense to the debt*, rather than a factual inaccuracy in Defendant[]'s reporting." *Id.* at *2 (emphasis added).

The dispute at the heart of this action is one of debt enforceability and validity. It is factually accurate that a DirecTV account was opened in Plaintiff's name and using her social security number and date of birth. Plaintiff does not dispute those

10

facts nor does she dispute the balance on the account. Instead, she disputes its enforceability against her because she did not open the account; that is, it was a fraudulent account because she was the victim of identity theft. AT&T investigated her assertion and concluded that the debt was valid, and then communicated this finding to ICS.

Plaintiff insists that ICS violated FCRA in its investigation of Plaintiff's dispute as evidenced by its failure to independently conclude that the account was fraudulent and that Plaintiff was not responsible for the debt and therefore should have "correct[ed] its mistake" and requested that the information be deleted. (Doc. 125 at 19.) But Plaintiff's arguments ignore the fact that AT&T, as the creditor, was in the best position to determine whether the account was fraudulent and that ICS had no right to "relieve [Plaintiff] of [her] obligation to [AT&T]." *Brill v. TransUnion*, No. 15-cv-300-slc, 2015 WL 9095103 at *4 (W.D. Wis. Dec. 16, 2015), *aff'd* 838 F.3d 919 (7th Cir. 2016). And further, these arguments ignore the fact that AT&T never notified ICS during the initial reporting and dispute process that the debt was inaccurate, invalid, or unenforceable against Plaintiff, and even after Plaintiff directly supplied AT&T with evidence that she believed showed she was a victim of identity theft. Instead, once it was in receipt of Plaintiff's dispute and after AT&T had affirmed the validity of the debt, ICS reported to the CRAs that the account was *disputed*, a true representation of the account status given the contrasting positions of Plaintiff and AT&T. (Doc. 123-1 at ¶ 28; Doc. 160-14.)

Plaintiff's assertion of fraud is a legal defense to the enforceability and validity of the AT&T debt rather than a factual inaccuracy in ICS's reporting.[4] The

---

[4] A factual inaccuracy "includes inaccurate amounts, tradeline items not immediately removed once vacated, and inaccurately updated loan terms, whereas legal inaccuracies include the validity of a debt or a dispute regarding to whom the debt was assigned." *Juarez v. Experian Info. Sols., Inc.*, No. 19-c-7705, 2020 WL 5201798, at *3 (N.D. Ill. Aug. 31, 2020) (alterations adopted) (citation omitted).

11

facts of the case here show that ICS reported the account as disputed. Because Plaintiff is really attempting to attack collaterally the information which underlies the credit report, she has failed to provide sufficient evidence showing that a reasonable investigation would have revealed that ICS was inaccurately reporting the account. Her FCRA claim therefore fails and ICS is entitled to summary judgment.[5] For the same reasons, Plaintiff's motion for summary judgment will be denied.

## B. FDCPA Claim

Plaintiff alleges that ICS violated 15 U.S.C. § 1692e of the FDCPA because ICS sent her a letter on May 24, 2021 falsely stating that Plaintiff owed a debt on the AT&T account and that this letter "was a false representation of the character, amount, and legal status of a debt." (Doc. 1 at ¶¶ 101–02.) ICS argues that it is entitled to summary judgment under the FDCPA's bona fide error defense.

The bona fide error defense provides:

> A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures *reasonably adapted to avoid any such error*.

15 U.S.C. § 1692k(c) (emphasis added). To be afforded the defense, a debt collector bears the "burden of showing that its FDCPA violation (1) was not intentional; (2) was a bona fide error; and (3) occurred despite the maintenance of procedures reasonably adapted to avoid any such error." *Owen v. I.C. System, Inc.*, 629 F.3d 1263, 1271 (11th Cir. 2011) (quoting *Edward v. Niagara Credit Sols., Inc.*, 584 F.3d 1350, 1352–53 (11th Cir. 2009)) (quotation marks omitted).

---

[5] The Court pretermits discussion of the damages issue.

*1. May 24, 2021 Letter*

Plaintiff claims that the May 24, 2021 letter violated the FDCPA. This letter was entitled "Collection Notice" and contained the following information: (1) Plaintiff had a delinquent account with AT&T that had been referred to ICS for collection; (2) ICS had scheduled the debt for reporting to the CRAs; (3) ICS would not submit the account until a thirty-day time period expired; (4) Plaintiff could pay the account balance by sending a payment to ICS; and (5) ICS would assume the debt was valid if Plaintiff did not notify ICS in writing within thirty-days of receiving the letter that the debt was disputed. The letter also stated that if Plaintiff felt she had been a victim of identity theft she should call AT&T directly.

As applicable to the bona fide error defense, ICS argues that there is no evidence that ICS intentionally violated the FDCPA in sending the letter because the evidence demonstrates that AT&T maintained that Plaintiff was liable on the account, even after she claimed fraud and identity theft. (Doc. 123 at 25–26, n.9.) Plaintiff disagrees with this, stating it was intentional because none of her true contact information was included in the account data ICS received from AT&T and was only found through skip tracing procedures. (Doc. 154 at 27 n.10.)

The Court agrees with ICS that the evidence demonstrates it did not intentionally violate the FDCPA here because an account was opened in Plaintiff's name with her social security number and her date of birth and AT&T referred the account to ICS under a contractual representation that the debt was valid and owing. ICS sent Plaintiff the initial collection notice using the address it received when it queried Plaintiff's social security number with its third-party vendors. No evidence has been provided showing that ICS intended to violate the FDCPA when it sent this letter to the Plaintiff at her residential address. "A debt collector need only show that its FDCPA violation was unintentional, not that its actions were unintentional."

*Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 537 (7th Cir. 2005). Accordingly, ICS has sufficiently shown that it did not intend to violate the FDCPA when it sent the May 24, 2021 letter to Plaintiff.

Plaintiff does not challenge whether ICS's action in sending the collection letter was a "bona fide error." As such, it will be presumed that any violation of the FDCPA in sending the letter was "made in good faith[,]" meaning it was a bona fide error under 15 U.S.C. § 1692k(c). *Kort*, 394 F.3d at 538 (quoting *Black's Law Dictionary* 168 (7th ed. 1999) (defining "bona fide" as "1. Made in good faith; without fraud" and "2. Sincere; genuine")).

This leaves for consideration the third factor—whether the violation occurred despite the maintenance of procedures reasonably adapted to avoid any such error. The Eleventh Circuit has stated that the furnisher must show that it has maintained procedures that are reasonably adapted to avoid readily discoverable errors. *Owen*, 629 F.3d at 1276–77.

ICS first points to its contract with AT&T that requires the referral for collection of only debts that are due and owing. ICS has also presented evidence showing that it has procedures in place and that these procedures include the use of third-party vendors to ensure the information provided by AT&T is verified and accurate. Not applicable here but worth noting, ICS also performs bankruptcy scrubs on all information received from AT&T to ensure that a debt has not been discharged through bankruptcy. (Doc. 123-1 at ¶ 9.) All of this occurs before ICS attempts to make its first contact with a consumer or reports a debt to any CRA. Put another way, ICS takes information from AT&T, transmits that same information to third-party vendors for verification, then uses information from the third-party vendors to contact a debtor. All well and good. In addition, ICS has presented evidence showing that it trains its employees on how to deal with consumers who claim that their referred AT&T accounts are the result of identity theft. Based on this, and the other

14

evidence in the record, ICS has met its low threshold of showing that it maintained procedures to avoid errors. *See Owen*, 629 F.3d at 1274. But was the purported error readily discoverable?

Turning to the reasonably adapted procedures component, Plaintiff argues that ICS "did not run any checks to determine if the [social security] number provided with the [a]ccount was fraudulent." (Doc. 125 at 3.) But Plaintiff does not inform ICS nor the Court on what type of "check" would have revealed a readily discoverable error between the information ICS received by AT&T and the information received from Innovis. And that is because identity theft involves the mimicking of another person's identifying demographic information for the purpose of committing fraud. *See Black's Law Dictionary* (11th ed. 2019) (defining identity theft). A person engaging in identity theft would be using valid identifiers for the purposes of stealing, like a person's name, date of birth, and social security number.

However, ICS has not shown, at the present stage, how its procedures were tailored to prevent collections on accounts associated with identity theft prior to sending am initial collection notice. Here, ICS merely referred the account information from AT&T (which included the Plaintiff's social security number and date of birth) to Innovis, who—because it was Plaintiff's actual demographic information used to open the account—identified Plaintiff as the person associated with the account. ICS ignored, or at least did not find it relevant, that the account address and phone number it received from AT&T did not match the address and phone number it received from Innovis.

Whether ICS had procedures reasonably adapted to prevent readily discoverable errors on the AT&T account is a close call. There is undisputed evidence that ICS trains employees on how to advise consumers who claim identity theft and that it maintains pre-collection procedures to verify the proper mailing address and phone number for consumers with delinquent accounts. However, there

15

is also evidence that this "training" does not become relevant until after ICS has made initial contact with a consumer informing them of a delinquent balance, like the May 24, 2021 letter, and the "training" is to merely refer the consumer to AT&T DirecTV's website to pursue their dispute there, as their contractual obligation requires them to do. And despite discrepancies between the account address and phone number and Plaintiff's verified address and phone number received from Innovis, ICS still sent a letter without doing more. At this point, there are simply insufficient facts to support a finding, as a matter of law, that ICS has a pre-collection procedure that is reasonably adapted to discover accounts opened as a result of identity theft. There were two facial discrepancies between the information transmitted by AT&T and that received from Innovis in the mismatched mailing address and phone number. And while ICS may have an explanation for why the account address and Plaintiff's address did not match, there is no explanation regarding the mismatched phone number.

The discrepancies, when examined in the light most favorable to Plaintiff, show that a genuine dispute of material fact exists as to whether ICS maintained procedures that were reasonably adapted to avoid readily discoverable errors on the account. Summary judgment is therefore inappropriate.

  2. *Other Alleged Violations*

In her opposition to summary judgment, Plaintiff claims that ICS also violated the FDCPA by continuing to report the account to Experian (doc. 154 at 30–31) after she had disputed the account with Experian. In addition to the bona fide error defense, ICS makes a more fundamental challenge to this claim.

ICS first urges the Court to ignore the credit reporting allegations because Plaintiff never pled them in her complaint and never directly mentioned them in her interrogatory answers that asked pointed questions about what conduct constituted

an FDCPA violation. (Doc. 169 at 15–16.) Instead, the only reference to the credit reporting and the FDCPA was Plaintiff's assertion that ICS violated the FDCPA "[e]ach time that [ICS] received a dispute from a credit reporting agency through which Plaintiff disputed the debt and [ICS] reported that the debt belonged to the Plaintiff." (Doc. 169-1.) While her interrogatory answers and complaint are somewhat vague, they sufficiently put ICS on notice that she was claiming that ICS violated the FDCPA in reporting the account to the CRAs after she had disputed the account with Experian. Regardless, Plaintiff's FDCPA claims fail on this set of allegations anyway.

ICS argues that it was merely following the requirements of the FCRA when it responded to Experian after Plaintiff had filed disputes with Experian and therefore these FCRA obligations cannot simultaneously constitute an FDCPA violation. (Doc. 123 at 30–31.) The Court agrees. "While the FDCPA governs a debt collector's verification of a disputed debt to a consumer . . ., a different statute—the FCRA—governs a debt collector's verification of a disputed debt to a credit reporting agency." *McIvor v. Credit Control Servs., Inc.*, 987 F. Supp. 2d 968, 971 (D. Minn. 2013), *aff'd* 773 F.3d 909 (8th Cir. 2014) (alterations adopted) (citation omitted). It "makes little sense to view the FCRA verification as a prohibited attempt at debt collection in violation of the FDCPA." *Id.* (alterations adopted) (citation omitted). ICS was not acting on its own initiative, but in response to a notice sent by Experian. And the debt collector is responding to that notice to avoid violating FCRA, not to collect a debt. *See* 15 U.S.C. § 1681s-2(b)(1)(C) ("After receiving notice [from a CRA] of a dispute with regard to the completeness or accuracy of any information provided by a person to a [CRA], the person shall . . . report the results of the investigation to the [CRA].") Thus, Plaintiff's attempts to create a FDCPA

17

violation based on ICS's actions in responding to Experian's dispute notices will not support an FDCPA cause of action here.[6]

In her opposition brief, Plaintiff also appears to vaguely implicate several June 2021 phone calls she made to ICS. ICS argues that Plaintiff did not plead this in her Complaint. Upon review of the Complaint, it is apparent that Plaintiff did not include allegations stemming from her June 1, June 10, or June 21 phone calls in Count Five and she did not address them in her factual allegations. As such, to the extent Plaintiff now argues that the contents of those phone calls were violations of the FDCPA, those calls are not actionable. And since the phone calls were not pled in the Complaint, and are only now implicated at summary judgment, albeit vaguely, the Court will not rewrite the Complaint to allow an FDCPA violation related to the June phone calls to go forward. *See Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

## V.   CONCLUSION

Accordingly, it is **ORDERED** as follow:

1. Defendant's *Motion for Summary Judgment* (doc. 123) is **GRANTED IN PART** and **DENIED IN PART**;
2. As to Count Four, Defendant's *Motion for Summary Judgment* (doc. 123) is **GRANTED**;
3. As to Count Five, Defendant's *Motion for Summary Judgment* (doc. 123) is **DENIED** as to the May 24, 2021 letter;

---

[6] Plaintiff has not made similar claims with respect to any communications with any other CRA.

4. To the extent Defendant moves for summary judgment with respect to the remaining Count Five claims, Defendant's *Motion for Summary Judgment* (doc. 123) is **GRANTED**;

5. Plaintiff's *Motion for Partial Summary Judgment* (doc. 124) is **DENIED**.

**DONE**, on this the 28th day of March 2024.

R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE